## MASTER SETTLEMENT & RELEASE AGREEMENT

This Master Settlement & Release Agreement (the "Master Agreement") is made effective as of the 13th day of April, 2015, by and among MITCHELL CHAD BARRETT, ("Barrett") and Tyler Barrett ("Tyler") and WORLD HEALTH INDUSTRIES, INC. (the "Company"), JASON RUTLAND, CHRISTOPHER MERRIWETHER, JAMES BENNETT, SHARON DURHAM, ANGELA NICOLE HOTARD, and ROBERT DURHAM (collectively the "Remaining Owners") pertaining to disputes pending in and otherwise related to *Mitchell Chad Barrett vs. World Health Industries, Inc., et al.*, Civil Action Number G-2015-241, in the Chancery Court of Hinds County, Mississippi, First Judicial District (the "Action").   BARRETT, the COMPANY and the REMAINING OWNERS are sometimes collectively referred to herein as the PARTIES.

### RECITALS

A.   On February 19, 2015, Barrett filed the Action.

B.   On February 27, 2015, the Parties agreed to work together to settle their disputes in the Action and otherwise pursuant to an Agreed Order and Outline of Proposed Terms of Settlement ("Settlement Terms") attached hereto as **Exhibit A**.

C.   The Parties have negotiated and prepared ownership transfer and related documents consistent with the Agreed Order and Settlement Terms and now desire to finally settle and resolve all differences and disagreements that could or do exist among them arising out of or related to the Action, and all other disputes or disagreements relating to the operations of businesses in which they are directly or indirectly co-owners or investors and any and all related activities; and, with the exception of matters specifically reserved below,  to resolve and release all claims of any kind relating to all other transactions, events, conduct or circumstances that may have occurred or existed prior to the date of final execution of this Master Agreement.

D.   The Parties intend in this Master Agreement to conclude all disputes among all other Parties hereto, known and unknown, and to release any claims arising out of or related to any and all actions taken as owners, directors, managers or officers of companies in which they have a common interest, including, but not limited to, the companies described in **Exhibit B**.

NOW, THEREFORE, in consideration of the above premises and of the mutual covenants of each of Barrett, Tyler, the Remaining Owners, and the Company, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree as follows:

EXHIBIT 1

**AGREEMENT**

1. <u>**Execution and Delivery of Documents and Consummation of Transactions.**</u>

    a.    Attached as <u>**Exhibit C**</u> are all of the ownership transfer and related documents (the "Transaction Documents") prepared for accomplishing the exchanges, assignments and actions described in the Settlement Terms. The terms and conditions set forth herein govern each of those Transaction Documents. These documents shall only be enforceable once all others are executed by the Parties to this Master Agreement[1] at the Closing Date.

        (i)    Execute and deliver the Transaction Documents and any other documents required in same to the other party or parties to such documents.

        (ii)    Consummate the transactions described in the Transaction Documents in a single closing and to carry out such actions as are necessary and/or as reasonably requested by the other parties thereto to effect the transactions described in such documents.

    b.    <u>Miscellaneous Definitions.</u>

        (i)    The entities in which Barrett receives assignments of ownership interests under the Transaction Documents shall be referred to hereinafter as the "<u>Barrett Entities</u>."

        (ii)    The entities in which some or all of the Remaining Owners receive ownership interests under the Transaction Documents shall be referred to hereinafter as the "<u>Remaining Owner Entities</u>."

        (iii)    The closing of the transactions described in the Transaction Documents shall occur effective as of April 13, 2015; this being the date of execution and delivery by all parties of the Master Agreement and such date shall be deemed to be the "<u>Closing Date</u>" for all of the simultaneous transactions described in the Transaction Documents.

---

[1] The signatures of commonly-owned corporations or LLCs that are owned or controlled by third-parties are provided for in the signature pages of certain Transaction Documents. The Parties to this Master Agreement agree that whether or not those third-party signatures are obtained on certain Transaction Documents shall have no bearing, force or effect regarding the enforceability of the Parties' settlement, the Master Agreement or any Transition Document. The signatures are sought merely as an accommodation to the transferee party in the respective Transaction Document, in order to confirm that the transferee may exercise full shareholder or membership interests in the third-party owned entity. The Parties expressly acknowledge that there is no guarantee that the third-party shareholders or members of the subject entities will consent to any interest outside of the monetary interest being disavowed/transferred, and that each Party is assuming the risk that those entities may not sign certain Transaction Documents without further recourse.

2.      **Mutual Releases and Covenants Not to Sue.**

    a.    The Company and the Remaining Owners hereby release, finally discharge and covenant not to sue one another, Barrett, Tyler and their present and former agents, attorneys, representatives, assigns and successors in interest (including the Barrett Entities and the Remaining Owner Entities) or any of their family members or insurers, from and for any and all claims, causes of action, liabilities, damages, costs, fees, attorney's fees, punitive damages and suits of any kind which:

        (i)    have been asserted or could have been asserted in or described in the Action; or

        (ii)    arise out of or relate to the operations of the Company and any of the businesses connected to the operations of the Company through the Date of Closing, including, but not limited to, the entities described in **Exhibit B**; or

        (iii)    arise out of or concern matters that are unrelated to any of the events or proceedings described or identified in the Recitals or Paragraph 2(a)(i) or 2(a)(ii) of this Master Agreement, but which arise out of any other transactions, events, conduct or circumstances that may have occurred or existed on or prior to the date of this Master Agreement.

    b.    Barrett and Tyler hereby release, finally discharge and covenant not to sue one another, the Company and the Remaining Owners, their present or former officers, directors, employees, attorneys, representatives, assigns, insurers and successors in interest (including the Remaining Owner Entities and the Barrett Entities) or any of their family members or insurers, from and for any and all claims which have been asserted or could have been asserted in the Action and any and all other claims, causes of action, demands, liabilities, damages, costs, fees, attorney's fees, punitive damages and suits of any kind based on the events or proceedings described or identified in Paragraph 2(a)(i)-(iii) of this Master Agreement.

    c.    To avoid doubt above, this Master Agreement seeks complete peace by and between all the Parties vis-à-vis one another and for the operations of the companies described in **Exhibit B** to begin without threat of litigation from any other party hereto. Barrett, Tyler, the Company, and the Remaining Owners specifically acknowledge and agree that they intend that the claims released herein by Barrett, Tyler, the Company, and the Remaining Owners shall include all claims of any sort that may exist up to and on the date of this Master Agreement against any other Party to this Master Agreement, whether or not such claims are related in any way to the events and proceedings described or identified in the Recitals or Paragraph 2(a)(i) or (ii) of this Master Agreement.

d.  In addition to their covenants not to sue, the Parties will not, indirectly or directly, instigate, participate in, encourage, or in any way assist or aid any other person or entity in any formal or informal legal action against any other Party or Parties to this Master Agreement for any matter in any way to the events and proceedings described or identified in the Recitals or Paragraph 2(a)(i), (ii) or (iii) of this Master Agreement for three (3) years from the date of the Closing Date.

3.  **Accounting True Up.**

a.  The Parties agree that, as a result of the closing of the transactions described herein, there will need to be an accounting "true up" to reconcile funds to be provided to or received from the Barrett Entities. The Company and the Remaining Owners acknowledge and agree that such reconciliation should happen within 60 days after the Closing Date.

b.  The Company and the Remaining Owners represent and warrant that: (i) the accounting "true ups" of the bank accounts of the Barrett Entities and Remaining Owners Entities through February 16, 2015, were prepared consistent with the respective management or other operative agreements in effect for each such entity, or (ii) to the extent there were no such management or other operative agreements in effect for an entity, that they have used the same customs and procedures in accounting for such entity as has been used since the entity's affiliation with the Company.

c.  For the time period from February 17, 2015, through the Closing Date, the Company, Barrett, and the Remaining Owners agree to perform an accounting "true up" of the bank accounts of the Barrett Entities based on the actual income realized by each entity and actual expenses incurred by the entities, including all attorneys' fees incurred in this Litigation which all Parties agree is to be assessed as shared expenses amongst the Barrett Entities and the Remaining Owner Entities in the manner set forth in Article 23 below. The Parties agree that the review and reconciliation of amounts owed to or from the Barrett Entities as a result of the accounting "true up" processes described above (the "Reconciliation") for the period February 17, 2015 to the Closing Date will be performed by Todd Boolos of the Boolos CPA firm, 1007 Mission Park Dr, Vicksburg, MS 39180 (the "Accounting Firm") in conjunction with one representative from Barrett and one representative from the Company. The Parties agree to diligently work with the Accounting Firm to produce the Reconciliation no later than 60 days after the Closing Date.

d.  Within ten (10) days after the delivery of the Accounting Firm's report setting forth its opinion as to the Reconciliation, either the Company or Barrett may raise an objection based either on mistake in calculation or that the proposed Reconciliation was not performed in accordance with the agreements in subparagraphs "a," "b," or "c" above. Such objection shall

4

be in writing and describe the reason for objection in such reasonable detail as to allow the Accounting Firm and the non-objecting party to understand the basis for such objection. In the event that such an objection is not raised within the ten (10) day period, the opinion presented by the Accounting Firm shall be the Final Reconciliation. In the event such an objection is made, the Accounting Firm shall review the objection made and shall either change the Reconciliation to correct it, or shall explain in writing the basis for its determination that the Reconciliation is correct. The Reconciliation so corrected or the Reconciliation with such written explanation shall be deemed to be the Final Reconciliation and is non-appealable by any of the Parties.

e.   Related to the January 1, 2014, through the Closing Date true up/ reconciliation process as described above, the Parties agree that any funds due to or from the Barrett Entities for the period beginning February 17, 2015 to the Closing Date will be paid within 10 days after the Final Reconciliation (as defined below).

**4.   Transfer of Prescriptions.**  The Parties agree that certain prescriptions will be transferred between the Barrett Entities and the Remaining Owner Entities, either by the agreement of the Parties or at the request of a distributor, representative, or patient. Until such time as those prescriptions are transferred, Barrett and the Remaining Owners agree that they will act in comportment with their prior agreements and dealings with regard to each prescription submitted thereto until such time as those prescriptions are transferred. Specifically, the Barrett Entities and the Remaining Owner Entities agree to properly pay all commissions due and owed to a distributor or representative for a prescription filled or refilled by either a Barrett Entity or a Remaining Owner Entity, regardless of whether that distributor or representative has decided to transfer future prescriptions to an entity covered by this Agreement.

**5.   Dismissal with Prejudice**. The Parties agree to file a stipulation of dismissal with prejudice in the Action within ten (10) business days after the Closing Date, with the exception of the claims against Defendant Mack Robinson which all Parties agree are to be dismissed without prejudice. All Parties to this Master Agreement reserve any and all rights against that individual.

**6.   Competition and Solicitation.**

a.   The Company and the Remaining Owners acknowledge and agree that Barrett, Tyler and the Barrett Entities and their respective affiliates (i) may (a) compete with the Company, the Remaining Owners and the Remaining Owner Entities; and (b) solicit customers, employees and other third parties with whom the Company, the Remaining Owners and the Remaining Owner Entities have or had relationships prior to the effective date of the Definitive Agreements or thereafter, and (ii) are released from any fiduciary duty or other obligations that may have been owing to the Company, the Remaining Owners and the Remaining Owner Entities not to so compete or solicit, and that Barrett, the Barrett Entities and their

5

respective affiliates have no confidentiality obligations to the Company, the Remaining Owners and the Remaining Owner Entities and no restrictions as to their respective information and the use thereof except patient and prescription confidentiality that may be required by the Health Insurance Portability and Accountability Act ("HIPAA") or other federal and state healthcare law or regulation.

b.      Barrett and Tyler personally acknowledge and agree that the Company, the Remaining Owners, the Remaining Owner Entities  and their respective affiliates (i) may (a) compete with Barrett, Tyler and the Barrett Entities; and (b) solicit customers, employees and other third parties with whom Barrett, Tyler and the Barrett Entities have or had relationships prior to the effective date of the Definitive Agreements or thereafter, and (ii) are released from any fiduciary duty or other obligations that may have been owing to Barrett, Tyler and the Barrett Entities not to so compete or solicit, and that the Company and the Remaining Owners have no confidentiality obligations to Barrett, Tyler and the Barrett Entities and no restrictions as to their respective information and the use thereof, except patient and prescription confidentiality that may be required by HIPAA or other federal or state healthcare law or regulation.

7.   **Indemnity.**

a.      To the extent not otherwise covered by insurance, Barrett agrees to indemnify and hold harmless the Company for 19.5% of any damages or losses incurred by the Company in the *Adams v. WHI, LLC, et. al.* lawsuit pending against it and filed prior to the Closing Date (the "Pending *Adams* Litigation"). "Losses" shall include attorneys' fees and expenses incurred by the Company in defending the Company and Barrett in the action.

b.      To the extent not otherwise covered by insurance, the Company agrees that Barrett will be individually defended by the Company's attorney. Furthermore, all signatories to this Master Agreement will cooperate and work together in defending the Company and one another in the Pending *Adams* litigation barring some unknown and unforeseen proof of fraudulent or malicious conduct by one of the *Adams* Defendants. The Company will front the costs of Barrett's individual defense in the manner described in 7(a) above. If a judgment is entered against Barrett individually in the *Adams* litigation, he acknowledges and agrees that he is and remains personally and fully responsible for payment for this personal judgment against him.

c.      To the extent not otherwise covered by insurance, Barrett agrees to indemnify and hold harmless the Company for 12.4% of any damages or losses incurred by the Company in any future litigation brought by Mack Robinson that may arise out of his alleged ownership interest in the Company (the "Potential *Robinson* Litigation"). "Losses" shall include

attorneys' fees and expenses incurred by the Company in defending the Company and Barrett in the action.

d. To the extent not otherwise covered by insurance, the Company agrees that Barrett will be individually defended by the Company's attorney. Furthermore, all signatories to this Master Agreement will cooperate and work together in defending the Company and one another in the Potential *Robinson* Litigation barring some unknown and unforeseen proof of fraudulent or malicious conduct by any party to this Master Agreement. Specifically, all signatories to this Master Agreement agree that their factual and legal position in the Potential *Robinson* Litigation will be that Mack Robinson's ownership interest in the entities covered by the Master Agreement is limited to a 20% ownership interest in the durable medical equipment business of the Company, and that Mack Robinson does not, nor has he ever, had an ownership interest in the clinics and/or pharmacies of the Company.  The Company also will front the costs of Barrett's individual defense in the manner described in 7(a) above. If a judgment is entered against Barrett individually in the Potential *Robinson* Litigation, he acknowledges and agrees that he is and remains personally and fully responsible for payment for this personal judgment against him.

e. Beyond the Pending *Adams* Litigation and the Potential *Robinson* Litigation, and to the extent not otherwise covered by insurance, Barrett agrees to indemnify and hold harmless the Company and the Remaining Owners for any damages or losses incurred by the Company, the Remaining Owners or the Remaining Owner Entities in litigation for any unilateral actions, unapproved by any Defendant, taken by Barrett personally or in his capacity as an officer of the Company or any of the entities described in **Exhibit B** prior to the Closing Date. "Losses" shall include attorneys' fees and expenses incurred in defending the action. These obligations shall not arise from damages or losses incurred due to actions that are known as of the Closing Date to the Company, the Remaining Owners or the Remaining Owner Entities.

f. Beyond the Pending *Adams* Litigation and the Potential Robinson Litigation, and to the extent not otherwise covered by insurance, the Company and the Remaining Owners agree to indemnify and hold harmless Barrett and the Barrett Entities for any damages or losses incurred in litigation by Barrett or the Barrett Entities for any unilateral actions taken, unapproved by Barrett, by the Company or the Remaining Owners personally or in their capacity as an officer of the Company or any of the entities described in **Exhibit B** prior to the Closing Date. "Losses" shall include attorneys' fees and expenses incurred in defending the action. These obligations shall not arise from damages or losses incurred due to actions that are known as of the Closing Date to Barrett or the Barrett Entities.

7

g.    In the event that Mack Robinson files a lawsuit arising out of his alleged ownership of any entity covered by the Master Agreement against Chad Barrett and/or one of the Barrett Entities only, the Company and the Remaining Owners agree not to oppose a motion by Barrett to add the Company and the Remaining Owners to the extent they are necessary parties to that litigation.

h.    In the event that Mack Robinson files a lawsuit arising out of his alleged ownership of any entity covered by the Master Agreement against the Remaining Owners and/or one of the Remaining Owner Entities only, Barrett agrees not to oppose a motion by the Company or the Remaining Owners to add Barrett to the extent he is a necessary party to that litigation.

i.    Tyler shall have no indemnity obligations whatsoever related to his membership with the Company or membership or shareholder status with any of the other companies listed in **Exhibit B**, or otherwise stemming from this Master Agreement or the Transaction Documents.

   8.    ***Shennaco Investments, Inc., et. al. v. World Health Industries, Inc., et. al.,*** **Cause No. 067-277477-15, In the District Court of Tarrant County, Texas**. The Parties have reached the following terms with regard to resolving the *Shennaco Investments* Lawsuit with the plaintiffs in that case:

a.    Cash Payments of $1,000,000 to Farm Operating, LLC.  Barrett agrees to pay the sum of $666,667.00, Rutland agrees to pay the sum of $166,666.67, and Durham agrees to pay the sum of 166,666.33.  They agree to make this payment within 1 business day of consummating the settlement.

b.    Secured Promissory Note.  RxPro Compounding and Pharmacy, Inc. and the Company agree to execute a Promissory Note ("Note") payable to ShennaCo in the amount of $1,000,000.  The Note shall be paid over 10 months at a rate of $100,000 per month, which the Barrett Entities being responsible for 34.5% of the monthly payment and the Remaining Owner Entities being responsible for 65.5% of the monthly payment.

c.    Guaranty Agreement. Rutland, Durham, Merriwether, Bennett, Hotard and Barrett agree to execute a Guaranty Agreement as security for the Promissory Note.

d.    Cancellation of Agreements.  Upon execution of the settlement agreement in the *Shennaco Investments* Lawsuit, the Parties agree that the D&M Agreements, to the extent any exist, are cancelled, terminated and declared null and void.

e.    Remaining Prescriptions.  The Company and the Remaining Owners agree that they will act in comportment with their prior agreements and dealings

with the ColorFarm entities until such time as there are no longer any ColorFarm prescriptions in the portal system.

The Parties agree that these terms are contractual.  More specifically, the Parties agree that they will consummate a settlement of the *Shennaco Investments* Lawsuit consistent with these terms unless the Plaintiffs in that lawsuit take any action that impedes the ability of the Parties to resolve the *Shennaco Investments* Lawsuit in comportment therewith.

**9.     Removal of Barrett as Guarantor and Payment of American Express and Construction Expenses.**  The Company and the Remaining Owners represent and warrant that they (a) will have Barrett removed as guarantor and obligor on the $1,600,000.00 line of credit and the $400,000.00 purchasing cards of the Company as soon as reasonably possible following the Closing Date, and (b) will pay an amount not to exceed $350,000.00 of the balance due on Barrett's American Express within the normal billing and payment cycle and no later the date on which failure to pay would affect Barrett's credit. These American Express charges include expenses incurred for the construction and improvement of the facility at the Jackson Medical Mall.

**10.     Discontinuance of Use of RxPro Name.**   All of the Parties agree to discontinue all use, in any form or capacity, of the name and/or mark "RxPro" within one hundred eighty (180) days after the Closing Date.

**11.     Intellectual Property Rights.**

a.     The Company and the Remaining Owners agree to provide Barrett and the Barrett Entities with the source code, data dictionary and data dump for the intellectual property and proprietary software used by the Company in maintaining and operating the portal and pharmacy prescription system between the Company and pharmacies and shall further provide Barrett with a non-exclusive license in the form attached as **Exhibit E**, to use such software. This license is solely for the Barrett Entities' right to use this software and any other use, copy, sale or license of the code, dictionary or data dump or subject software whatsoever without the express written consent of the Company and the Remaining Owners is prohibited and actionable in favor of the Company and the Remaining Owners.

b.     Barrett agrees and acknowledges that he does not own this intellectual property (the portals) and proprietary software and has only the non-exclusive license and rights provided for herein to such intellectual property.

**12.     Cooperation.**  For a period not to exceed thirty (30) days from the Closing Date, Jason Rutland or, if unavailable on occasion, a qualified individual, agrees to cooperate and agrees to assist Chad Barrett, in getting the Barrett Entities operational. Barrett and the Remaining Owners will request that Dr. Frank Corbo work with the Parties in this regard. During this period, Rutland promises full cooperation and assistance specifically including providing Barrett with a fully operational prescription system portal for use with pharmacies.

Once this portal is functioning normally (i.e., comparatively to the Barrett Entities' portal traffic prior to this Master Agreement) and the thirty-day period has expired, Rutland's obligation under this section is satisfied and he is fully released from any further obligation of cooperation.

13.     **Company's Representations and Warranties.**     Company represents and warrants to Barrett and the Remaining Owners as follows, with the knowledge that Barrett and the Remaining Owners are relying materially on all such representations and warranties:

a.     The Company is a corporation validly existing, in good standing and qualified to do business under the laws of the State of Mississippi. Consistent with the Agreed Order entered on February 27, 2015, and the spirit of the Parties' agreement on that date, the Company has continued to operate in the best interests of the Company, the Barrett Entities, and the Remaining Owner Entities.

b.     This Master Agreement and the transactions contemplated herein have been duly authorized by all necessary actions of the directors of the Company.   This Master Agreement constitutes an agreement by the Company to release claims and is enforceable in accordance with its terms, subject to general principles of equity and bankruptcy relating to or affecting the rights of creditors generally.   For purposes of the due authorization representation above, it is noted that the ownership of the Company and composition of the board of directors has been one of the disputes between the Parties.   In order to accommodate the Company being able to take a duly authorized action, the Parties have agreed that, contemporaneously with the execution of this Master Agreement, Barrett will forego his claims on this point and will therefore be treated as a 12.4% shareholder in the Company so that the Company and its shareholders can elect directors on the Closing Date and have the execution and delivery of this Master Agreement authorized by a duly elected board of directors.

c.     Master Agreement.   The making and performance of this Master Agreement by the Company will not conflict with the Company's articles of incorporation or bylaws, or violate any federal, state or local law, rule, regulation, order, writ, injunction, or decree, or constitute a violation of or default under, any contract or agreement that is binding on the Company.

d.     No representation or warranty made by the Company in this Master Agreement, nor any statement made or furnished or to be made or furnished by the Company to Barrett or the Remaining Owners pursuant hereto, or in connection with this Master Agreement or the transactions contemplated hereby, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading.

10

e.    The Company represents and warrants that it has had the benefit of counsel and that its authorized agents and attorneys have read and understood the Master Agreement, and that no representation has been made by any agent or attorney of any party concerning the validity or merit of any claim herein released, conveyed or assigned and that no such representation has induced it to sign the Master Agreement; and that the Company is acting solely upon its own best judgment, belief, and knowledge in entering into the Master Agreement, which is the result of arm's length negotiations with neither side having fiduciary or other special duties to the other.

**14.    Remaining Owners' Representations and Warranties.**    The Remaining Owners represent and warrant to Barrett and the Company as follows, with the knowledge that the Company and Barrett are relying materially on all such representations and warranties:

a.    The Remaining Owners represent and warrant that they have had the benefit of counsel and have read and understood this Master Agreement, and that no representation has been made by any agent or attorney of any party concerning the validity or merit of any claim herein released, conveyed or assigned; that no representation has been made by any agent or attorney of any party concerning the value of the Company, the Barrett Entities or the Remaining Owner Entities; and that no such representation has induced them to sign the Master Agreement; and that the Remaining Owners are acting solely upon their own best judgment, belief, and knowledge in entering into the Master Agreement, which is the result of arm's length negotiations.

b.    Notwithstanding anything to the contrary herein or in any bylaws, shareholder agreement, limited liability company agreement, operating agreement or any other agreement among the shareholders or members of the Company governing the affairs of the Company and its shareholders or members, to the extent that such an agreement exists, either verbal or in writing (collectively, the "Governing Agreement") or any relief provided to the contrary under state law, in order to accommodate Barrett, the Remaining Owners agree to waive any challenge or objection they may have related to their individual shareholder/membership or director/manager status in the Barrett Entities so that, contemporaneously with the execution of this Master Agreement, the Barrett Entities can elect managers and/or directors on the Closing Date and have the execution and delivery of this Master Agreement and the Transaction Documents authorized by duly elected managers and/or board of directors. In addition, the Remaining Owners recognize that the Barrett Entities will simultaneously remove them from any position within the Barrett Entities.

c.    No representation or warranty made by the Remaining Owners in this Master Agreement, nor any statement made or furnished or to be made or furnished by the Remaining Owners to the Company or Barrett pursuant

11

hereto, or in connection with this Master Agreement or the transactions contemplated hereby, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading.

**15.** **Barrett's Representations and Warranties.** Barrett represents and warrants to the Company and the Remaining Owners as follows, with the knowledge that the Company and the Remaining Owners are relying materially on all such representations and warranties:

    a. Barrett represents and warrants that he has had the benefit of counsel and that his authorized agents and attorneys have read and understood this Master Agreement, and that no representation has been made by any agent or attorney of any other party concerning the validity or merit of any claim herein released, conveyed or assigned has induced him to make the Master Agreement; that no representation has been made by any agent or attorney of any party concerning the value of the Company, the Barrett Entities or the Remaining Owner Entities; and that no such representation has induced him to sign the Master Agreement and that Barrett is acting solely upon his own best judgment, belief, and knowledge in entering into the Master Agreement, which is the result of arm's length negotiations.

    b. Notwithstanding anything to the contrary herein or in the Governing Agreement or any relief provided to the contrary under state law, in order to accommodate the Remaining Owner Entities being able to take a duly authorized action, Barrett agrees to waive any challenge or objection he may have related to his shareholder/membership or director/manager status in the Company and the Remaining Owner Entities so that, contemporaneously with the execution of this Master Agreement, the Remaining Owner Entities can elect directors and/or managers on the Closing Date and have the execution and delivery of this Master Agreement and the Transition Documents authorized by duly elected managers and/or board of directors. In addition, Barrett recognizes that the Company and the Remaining Owner Entities will simultaneously remove him from any position within the Remaining Owner Entities.

    c. No representation or warranty made by Barrett in this Master Agreement, nor any statement made or furnished or to be made or furnished by Barrett to the Company or the Remaining Owners pursuant hereto, or in connection with this Master Agreement or the transactions contemplated hereby, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading.

**16.** **Entire Agreement.** This Master Agreement and the Transaction Documents together constitute the entire agreement of the parties, and there have been no representations made by any signatory hereto, either prior to or contemporaneously herewith, that are not embodied within the terms of these agreements. The Parties also agree that this Master

Agreement was prepared and drafted jointly by the Parties, in consultation with their counsel. No ambiguity in any provision shall be construed against either Party as the "drafter."

17. **Mississippi Law to Govern**. The Master Agreement shall be governed by and construed in accordance with the laws of the State of Mississippi.

18. **Agreement Not an Admission of Liability**. The undersigned acknowledge and agree that this Master Agreement is not an admission of liability concerning the merits of any of the claims referred to herein by any of the signatories hereto.

19. **Authority.** The undersigned signatories warrant and covenant that they have requisite legal authority to enter into the Master Agreement and to bind themselves and their respective principals to its terms.

20. **Execution in Counterparts.** This Master Agreement may be executed in counterparts.

21. **Dispute Resolution.** Any dispute or claim related to breach of any term of this Master Agreement shall be submitted to Judge Owens or another judicial officer assigned to the Action in the Chancery Court, First Judicial District of Hinds County, Mississippi. If any party believes it to be entitled to a trial by jury on such a dispute or claim or that the dispute or claim is otherwise beyond the jurisdiction of the Chancery Court, the issue may be raised and if the Court agrees, the claim or dispute may be resolved by the Court of competent jurisdiction in the First Judicial District of Hinds County, Mississippi. The Parties expressly acknowledge that any and all attorney's fees and expenses incurred in any proceeding brought under this Paragraph shall constitute part of the damages recoverable in such proceeding. The prevailing party shall be entitled to recover its reasonable costs, attorney's fees, and expenses.

22. **Confidentiality.** The Parties agree to keep the terms of this Master Agreement confidential and will not share any details herein with any third party unless compelled to do so by any federal or state regulatory agency or court order.

23. **Tax Consequences**.

    a.    The Parties acknowledge and agree that (i) the Company and the other parties may report any consideration (including cash settlements, ownership interest changes, etc.) provided for herein to the Internal Revenue Service and/or state and local tax authorities or agencies; (ii) that each party to this Master Agreement is solely responsible for determining and satisfying any tax liability resulting from any consideration provided pursuant to the Master Agreement and the attendant Transaction Documents and (iii) that no other party, no agent and no attorney has made any representations, or offered any advice or opinion, concerning the tax consequences of the parties' Master Agreement and the Transaction Documents. The undersigned Parties understand and acknowledge that the other parties have no responsibility for any tax liability the other occurs as a consequence of this Master Agreement and the Transaction Documents.

b.  In addition to the Reconciliation services to be provided pursuant to 3(c) above, the parties further agree that they shall utilize the services of the Accounting Firm to determine the valuations to be placed on all of the interests (membership, stock or otherwise) to be transferred by and among the parties in connection with the Transaction Documents. The parties further agree that the valuations so determined by the Accounting Firm shall be binding for all tax reporting purposes. The Parties shall report, act and file tax returns in all respects and for all purposes consistent with such valuations and shall not take any position (whether in audits, tax returns or otherwise) that is inconsistent with such valuations unless required to do so by applicable law.

24.  **Legal Fees.**  Consistent with payment of shared expenses among the Barrett Entities and Remaining Owner Entities, the Company will pay the legal fees and costs incurred by the Parties in the disputes leading up to this Master Agreement and in the work associated with this Master Agreement and the transactions described herein. The legal fees paid by the Company will then be reimbursed to Company by the Barrett Entities and the Remaining Owner Entities during the sixty-day true up period on the following percentage basis: 65.5% of the total paid is to be reimbursed from the Remaining Owner Entities and 34.5% of the total paid is to be paid by the Barrett Entities. These percentages are based on March 2015 percentages of Company revenues as agreed to by the Parties.

The February legal invoices will be paid within ten (10) days of the Closing Date and submission of counsels' invoice amounts as approved by their respective clients. The March legal invoices will be paid within thirty (30) days after submission of counsel's March invoice amounts as approved by their respective clients. The April legal invoices will be paid thirty (30) days after submission of counsel's April invoice amounts as approved by their respective clients. The Company shall not under any circumstances be responsible for legal fees or costs incurred by Barrett or the Barrett Entities for work performed after the Closing Date. After the Closing Date, all Parties are to bear their own attorneys' fees and costs.

25.  **Assumption of Risks.**  Given the nature of the transaction covered by the Master Agreement and the Transaction Documents, the time constraints at hand, the limited corporate governance documentation that exists with respect to most of the affected entities, and the limited information available to the parties and their counsel, the undersigned acknowledge and agree that there are numerous and inherent risks related to this transaction. These inherent risks include, but are not limited to, the risk that  the value of a company or corporation being assigned is not what they may think it is and the risk that certain Parties to this Master Agreement may own less or none of the companies or corporations than the interest stated or identified in the Transaction Documents and the risk  that certain third-party members or shareholders to the entities set forth in **Exhibit B** may not execute certain Transaction Documents or may not otherwise consent to the full ownership and participating rights of the transferred interest (membership or shareholder) after it is assigned in the Transaction Documents to the respective assignee. The undersigned also acknowledge and agree that they assume those risks, having been advised of those risks by counsel, and that should any of these possible risks occur they  shall have no effect on the enforceability of the terms of this Master Agreement.

**IN WITNESS WHEREOF**, the undersigned have executed this Master Agreement this, the ___ day of April, 2015.

**WORLD HEALTH INDUSTRIES, INC.:**

By:    _____
Its:    President

**BARRETT:**

_____
MITCHELL CHAD BARRETT

**TYLER:**

_____
TYLER BARRETT

**REMAINING OWNERS:**

_____
JASON RUTLAND

_____
CHRISTOPHER MERRIWETHER

_____
JAMES BENNETT

_____
SHARON DURHAM

_____
ANGELA NICOLE HOTARD

_____
ROBERT DURHAM

15

**IN WITNESS WHEREOF**, the undersigned have executed this Master Agreement this, the ___ day of April, 2015.

**WORLD HEALTH INDUSTRIES, INC.:**

By:    _____
Its:    President

**BARRETT:**

_____
　　　　MITCHELL CHAD BARRETT

**TYLER**:

_____
　　　　TYLER BARRETT

**REMAINING OWNERS:**

_____
JASON RUTLAND

_____
CHRISTOPHER MERRIWETHER

_____
JAMES BENNETT

_____
SHARON DURHAM

_____
ANGELA NICOLE HOTARD

_____
ROBERT DURHAM

# EXHIBIT A

AGREED ORDER AND SETTLEMENT TERMS



FILED

FEB 27 2015

MISSISSIPPI DIRR, CHANCERY CLERK

BY _____ D.C.

IN THE CHANCERY COURT OF HINDS COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

MITCHELL CHAD BARRETT

vs.                                                                    PLAINTIFF

Civil Action No. G-2015-241

WORLD HEALTH INDUSTRIES, INC., JASON RUTLAND,
CHRISTOPHER MERRIWETHER, JAMES BENNETT,
ROBERT DURHAM, SHARON DURHAM, ANGELA
NICOLE HOTARD, K. MACK ROBINSON and JOHN DOE
CORPORATIONS 1-100 and JOHN and JANE DOES 1-100

DEFENDANTS

## AGREED ORDER

This matter is before the Court on the <u>ore tenus</u> motion of the Parties to confirm the
Proposed Terms of Settlement, an Outline of which is attached hereto as Exhibit "A". Upon
entry of this Agreed Order, and until such times as the Proposed Terms of Settlement are
consummated and the parties have agreed upon a full and final release, resolving this civil action,
<u>in toto</u>, the Parties will work together to conduct the day-to-day operations of World Health
Industries, Inc., and all affiliated and subsidiary companies, with the best interest of those entities
in mind. The following additional terms apply:

1.     With the exception of on-duty law enforcement, carrying out his or her official
duty as a sworn officer on behalf of a local, state, or federal agency -- no
individual may enter any property or facility of World Health Industries, Inc., or
its affiliated and subsidiary companies, regardless of the class of license an
individual may have to do so -- with any firearm, munitions, ammunition, or
explosive devices in his or her possession, including constructive possession via
an automobile or other means of conveyance; and

2.     By this Agreed Order, the First Amended Verified Complaint for Injunctive
Relief, Declaratory Judgment, and Other Relief is withdrawn, without prejudice.

1

The Clerk of the Court is instructed to seal the file which can only be accessed by the attorney of record.

In the event that a dispute arises between the parties, the aggrieved party, through his undersigned counsel, will notify counsel for the aggrieving party of that dispute. Thereafter, there will be a two-day "cooling off" period during which time the parties will work in good faith to resolve their dispute. In the event that the parties cannot resolve their dispute, the parties will jointly seek judicial resolution.

The parties further agree that this civil action is stayed until (1) such time as the Proposed Terms of Settlement are consummated and the parties have agreed upon a full and final release, resolving this civil action, in toto, or (2) one of the parties makes an application to lift the stay, specifically certifying and providing evidence that the parties have, in good faith, attempted to consummate the Proposed Terms of Settlement, but could not.

The parties understand that the Temporary Restraining Order that was entered on February 20, 2015, has, or will, expire pursuant to the terms thereof, and, accordingly, Plaintiff's cash bond of $100,000.00, which he posted via Certified Check on February 20, 2015, is released.

So ORDERED, this the 27th day of February, 2015.

_Denise Owens_
Chancery Court Judge

2

PREPARED AND AGREED TO BY:

_____

ALAN W. PERRY (MBN 4127)
STEPHEN M. WILSON (MBN 9058)
ALEX PURVIS (MBN 100673)
MEGAN B. CONNER (MBN 102030)
CLARENCE WEBSTER, III (MBN 102111)
Bradley Arant Boult Cummings LLP
Suite 400, One Jackson Place
188 East Capitol Street
PO Box 1789
Jackson, MS 39215-1789
Telephone: (601) 948-8000
Facsimile: (601) 948-3000
*Counsel for Plaintiff Mitchell Chad Barrett*

_____

BRADLEY B. VANCE (MBN 100917)
JOHN M. LASSITER (MBN 102235)
Burr Forman LLP
401 East Capitol Street
Suite 100
Jackson, MS 39201
Telephone: (601) 355-3434
Facsimile: (601) 355-5150
*Counsel for Defendants*

## OUTLINE OF PROPOSED TERMS OF SETTLEMENT

World Health Industries, Inc., David Jason Rutland, Nicole Angela Hotard, James Bennett, Chris Merriwether, Sharon Durham and Mack Robinson (collectively referred to herein as the "Defendants") hereby make the following proposal for a settlement of all issues between themselves and Mitchell Chad Barrett pertaining to *Barrett v. World Health Industries, Inc., et al*.

1. Full ownership and control of the following pharmacy entities shall be transferred to Chad Barrett free and clear from any claims of the Defendants:

Estonna Management, LLC of Bonita Springs, FL
Rx Pro Pharmacy & Compounding, INC of Hallandale, FL
Care Rx Pharmacy Group, LLC of Boynton Beach, FL
RxPro Of Mississippi, LLC

Jackson Community Pharmacy, LLC

Chad Barrett will be responsible for the leases where these entities reside along with any and all debts associated with the above named entities.

2. The Defendants will relinquish all ownership in the following entities:

Amicus
Bambr - the parties agree to work toward a dissolution of this entity as soon as possible.
Fuse
PEPS, INC
WHIG Enterprises, LLC.  All existing contracts with entities retained by Defendants associated with this entity be voided at closing of the transactions contemplated by this Outline.
World Health Jets, LLC

3. Chad Barrett and Tyler Barrett will relinquish their ownership in the following entities.

World Health Industries, INC
WHI, LLC
Hotbar, LLC
Rx Pros, INC
Sterlington Village, LLC
Gluckstadt Special Care Pharmacy, LLC
Advanced Research Concepts, INC
World Health Industries Constr. Management Group, Inc.



World Health Industries Holding Company, Inc
Your Compounding Pharmacy, Inc
Medical Center Pharmacy, Inc
Mack Bayou Pharmacy
Jackson Community Pharmacy
Medical Center Lab
Vicksburg Special Care Pharmacy, LLC
Vicksburg Special Care Clinic, LLC

Except as described in the next sentence, the Defendants will be responsible for the leases where these entities reside along with any and all debts associated with the above named entities.  Barrett will transfer his ownership interest (but not the ownership interests of others) in the entity which owns and leases the property on whichSterlington Village, LLC and Rx Pros, Inc. operate to the Defendants at the closing of the transactions contemplated by this Outline.  Defendants will pay $250,000.00 to Chad Barrett for the purchase of his interest in the property upon with Vicksburg Special Care Clinic, LLC and Vicksburg Special Care Pharmacy, LLC.

4. Barrett will have the Defendants who are guarantors on the debt for World Health Jets, LLC removed as guarantors and in exchange the Defendants will assign their ownership interests in World Health Jets, LLC to Barrett at the closing of the transactions contemplated by this Outline.  The Defendants will buy Barrett's ownership interest in DB & Associates, LLC at a fair market non-discounted value as determined by an independent business appraiser chosen by mutual agreement of the parties.

5. The Defendants will disassociate with the following distributors/entities and the same shall constitute business directed to Chad Barrett's pharmacies hereunder:

Amicus Medical
Care Rx (Aims)
Argentum
BBB (3B Medical)
Bushwood
Denovo
Karshoe Enterprises
McDowell
Otter Partners
RX Consulting
JAR Financing
Blue Farm
Copper Farm
Green Farm
Platinum Farm
Purple Farm
Tangerine Farm
Titanium Farm

4/440319.4

Yellow Farm
PT 1000
Health Innovations
Health Advisors
PCI

6.  Defendants will agree to remove Chad Barrett as guarantor of the $1,600,000 revolving line of credit and the $400,000 purchasing cards indebtedness of WHI, LLC to Community Trust Bank, within such time as may be necessary.

7.   Defendants will pay off $700,000 on Chad Barrett's American Express card that has been used for Company purposes and such card will no longer be used by the Company or any of the Defendants.

8.   Defendants agree to provide Barrett with the source code, data dictionary and data dump, relating to the entities listed in Paragraph 5 above, for the proprietary software used by WHI and its affiliates and a non-exclusive license to use such software.

9.   Jason Rutland, or if unavailable on occasion a qualified individual, will cooperate, and agree to assist Chad Barrett as agreed by the parties, in getting his stores up and running along with a portal and the parties agree that Jason Rutland and Chad Barrett will request that Dr. Frank Corbo will work with him in this regard.  This cooperation and assistance specifically includes providing Barrett will a fully operational portal.

10.  In addition, Chad Barrett will give releases and indemnification holding the Defendants harmless for any actions taken by Chad Barrett while he was associated with WHI.  Likewise, the Defendants will give releases and indemnification holding Chad Barrett harmless for any actions taken by any of the Defendants.

11.  The Defendants will release Chad Barrett from any fiduciary duty or other obligation not to compete with WHI or any of its affiliates or not to solicit any of WHI's or its affiliate's customers, suppliers, employees, independent contractors or other third parties with whom WHI and its affiliates do business.

12.  The Defendants and Chad Barrett agree that WHI will pay the legal expenses for the two law firms (Bradley Arant and Burr Forman) involved in representing the parties in this dispute and settlement.  WHI will make no distributions (other than current salaries when due to be paid) to shareholders until after the closing of the transactions contemplated by this Outline.

13.  Both Chad Barrett and the companies with which he is or will be associated with and the Defendants and the companies with which they individually or collectively are or will be associated with will discontinue the use of the name and/or mark "RXPRO" within 180 days after the closing of the transactions contemplated by this Outline.

## **EXHIBIT B**

### MASTER LISTING OF ENTITIES

I.     Remaining Owner Entities (to be assigned to the Remaining Owners, and relinquished by Barrett and Tyler)

1.  Advanced Research Concepts, Inc.
2.  Bi-State Properties, LLC
3.  DB & Associates, LLC
4.  Gluckstadt Special Care Pharmacy, LLC
5.  Hotbar, LLC
6.  Jhobar Holdings, LLC
7.  Mack Bayou Pharmacy, LLC
8.  Medical Center Pharmacy, Inc.
9.  Rx Pros, Inc.
10. Sterlington Village, LLC
11. Vicksburg Special Care Clinic, LLC
12. Vicksburg Special Care Pharmacy, LLC
13. WHI, LLC
14. WHI & Associates, LLC
15. World Health Industries, Inc.
16. World Health Industries Construction Management Group, Inc.
17. World Health Industries Holding Company
18. Your Compounding Pharmacy, Inc.

II.    Barrett Entities (to be assigned to Barrett and relinquished by the Remaining Owners)

1.  Amicus Global Vision, LLC
2.  Bambr Holding, LLC
3.  BambrMS, Inc.
4.  Care Rx Pharmacy Group, LLC
5.  Estonna Management, LLC
6.  Fuse, LLC
7.  Fuse Medical Inc.
8.  Jackson Community Pharmacy, LLC
9.  PEPS, Inc.
10. RxPro of Mississippi, LLC
11. Rx Pro Pharmacy & Compounding, Inc.
12. WHIG Enterprises, LLC
13. World Health Jets, LLC

17

**EXHIBIT C**

RELATED TRANSFERS AND AGREEMENTS

**EXHIBIT D**

[INTENTIONALLY LEFT BLANK BY THE PARTIES]

## **EXHIBIT E**

## NON-EXCLUSIVE LICENSE

## LICENSE AGREEMENT

This LICENSE AGREEMENT (the "License") is made this __ day of April, 2015 by and between Mitchell Chad Barrett, an adult resident citizen of the State of Mississippi ("Barrett") and World Health Industries, Inc., a Mississippi corporation ("WHI").   Barrett and WHI shall sometimes be referred to herein individually as a Party or collectively as the Parties.

## R E C I T A L S:

WHEREAS, WHI and Barrett, along with other parties, are parties to that certain Master Settlement & Release Agreement dated of even date herewith (the "Master Agreement"), wherein the parties thereto have agreed to transfer and exchange interests in a number of entities, including the Company, to ensure that certain intellectual property utilized in the Company is made available to Barrett for continued use after the Closing Date (as defined in the Master Agreement), and to take other actions and enter other transactions described therein, all in settlement of issues between the parties to the Master Agreement; and

WHEREAS, in furtherance of the actions contemplated by the Master Agreement, WHI and Barrett desire to enter into this License in order to provide for Barrett's receipt of and continued use of the intellectual property, to be effective as of the Closing Date and in exchange for the consideration described by the Master Agreement and as otherwise contemplated therein.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and covenants contained herein and in the Master Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, WHI and Barrett hereby agree as follows:

## SECTION 1
## LICENSE

**1.1**   **License**.  WHI hereby grants to Barrett a perpetual, irrevocable, non-exclusive and royalty free license (the "License") to use the intellectual property defined on Exhibit "A" attached hereto and which is fully incorporated herein by this reference, which for the avoidance of doubt and misunderstanding, is intended by the Parties to include all the intellectual property, which shall include but not be limited to, all software IPs, applications, algorithms, processes, methods and the like,  currently used by WHI in its receipt, handling, fulfillment, distribution, inventory tracking and billing for product, in connection with its ordinary course of its business operations (collectively, the "IP"), all subject to the terms and conditions hereinafter set forth in this Agreement.

## SECTION 2
## DELIVERY; COPIES

**2.1**   **Delivery of the IP**.  Within three (3) days of the execution of this Agreement, WHI is required to deliver to Barrett two (2) copies of the IP, which shall be contained on machine-readable media that can be read by the hardware on which the IP is to be run, including but not limited to Barrett's operating system (the "Hardware"). Barrett will have the right, as part of the License granted herein, to make as many additional copies of the IP as he may deem necessary for use in any and all entities in which he has an ownership interest.

*Execution Version*

    **2.2**    **Delivery of Documentation**.  The Documentation will consist of any and all operator's and user's manuals, training materials, guides, commentary, listings and other materials for use in conjunction with the IP. Accordingly, within three (3) days of the execution of this Agreement, WHI is required to deliver to Barrett two (2) copies of said Documentation. Barrett will have the right, as part of the License granted herein, to make as many additional copies of the Documentation as it may deem necessary for use in any and all entities in which he has an ownership interest.

    **2.3**    **Bankruptcy**.  All rights and licenses granted under or pursuant to this Agreement by WHI to Barrett (including the License) are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the United States Bankruptcy Code (the "Code"), licenses to rights to "intellectual property" as defined under the Code. The parties agree that Barrett, as the licensee of such rights under this Agreement (including the License), shall retain and may fully exercise all of its rights and elections under the Code. The parties further agree that, in the event of the commencement of bankruptcy proceeding by or against WHI under the Code, Barrett shall be entitled to retain all of its rights under this Agreement (including the License).

### SECTION 3
### OPERATING ENVIRONMENT AND MODIFICATIONS

    **3.1**    **Operating Environment**.  The IP, and each module or component and function thereof, will be capable of operating fully and correctly on the Hardware. The Documentation will in all cases be fully applicable to use of the IP on the Hardware, and will identify and reflect any particular features of any of it that may affect the normal use and operation of the IP.

    **3.2**    **Conversion**.  WHI represents that the IP and Documentation are currently fully operational and being used on the configuration of Hardware and operating system and other required computer programs.

### SECTION 4
### INSTALLATION

    **4.1**    **IP Installation and Acceptance**.  Barrett shall install the IP on the Hardware and shall conduct all of his own testing procedures on the IP. The successful completion of Barrett acceptance testing will be deemed Barrett's acceptance of the IP. In the event that the IP fails to pass any of the Barrett testing procedures or fails to function properly or in conformity with the description, specifications contained in the Documentation, then WHI will have five (5) days in which to correct such defect and cause the IP to successfully pass all such tests or function as aforesaid, failure to do so shall constitute a material default hereunder.

### SECTION 5
### SCOPE OF USE

    The license hereby granted permits Barrett to use the IP and the Documentation, in the course of his business operations and for his own business purposes including, but not limited to, processing information and that of his customers as part of his business. By way of confirmation

*Execution Version*

and to avoid future misunderstanding, the license to Barrett shall extend to any business entity or organization in which Barrett has an ownership interest.

## SECTION 6
## RIGHTS AND OBLIGATIONS

**6.1**    **WHI's Warranties**.  WHI hereby warrants and represents to Barrett as follows:

(a) *Ownership.* WHI is the owner of the IP or otherwise has the right to grant to Barrett the License without violating any rights of any third party, and there is currently no actual or threatened suit by any such third party based on an alleged violation of such right by WHI;

(b) *No Viruses.* WHI warrants that the IP and each component thereof does not, and will not when delivered, contain any pre-programed devices, such as "viruses" or other such devices, that will cause the IP or any component thereof to be erased or become inoperable or incapable of processing or affect operations of other systems.

**6.2**    **Barrett Modifications**.  Barrett will have the absolute right, in its own discretion, to independently modify the IP for its own use, through the services of its own employees or of independent contractors. Barrett shall be deemed to be the owner of any such modifications, which shall be deemed confidential information of Barrett, and WHI shall have no claim of ownership, access or other entitlement with respect to any such modification.

**6.3**    **Indemnity**.  WHI, at its own expense, shall indemnify and hold harmless Barrett and any user through Barrett pursuant to the Scope of Use provided for in Section 5, and defend any action brought against same with respect to any claim, demand, cause of action, debt or liability, including attorneys' fees, to the extent that it is based upon a claim that the IP used hereunder infringes or violates any patents, copyrights, trade secrets, licenses, or other property rights of any third party. Barrett may, at its own expense, assist in such defense if it so chooses, provided that, as long as WHI can demonstrate sufficient financial resources, WHI shall control such defense and all negotiations relative to the settlement of any such claim and further provided that any settlement intended to bind Barrett shall not be final without Barrett's written consent, which shall not be unreasonably withheld. Barrett shall promptly provide WHI with written notice of any claim which Barrett believes falls within the scope of this paragraph. WHI agrees to indemnify Barrett for any liability or expense due to claims for personal injury or property damage (i) arising out of the furnishing or performance of the IP or the services provided hereunder or (ii) arising out of the fault or negligence of WHI, its employees or agents.

**6.4**    **Third Party IP**.  WHI hereby represents and warrants that the IP as provided by WHI to Barrett does not require the use of third party IP.

## SECTION 7
## CONFIDENTIALITY AND PROPRIETARY RIGHTS

**7.1**    **Confidentiality**.  Each Party agrees that it shall not disclose to any third party (except with respect to Barrett as provided for herein with respect to Sections 5 and 6.2) any information concerning the IP of the other Party that it learns during the course of its performance

- 3 -

*Execution Version*

of this Agreement, without the prior written consent of such other. This obligation will survive the cancellation or other termination of this Agreement.

**SECTION 8**
**GENERAL**

     **8.1**    **Assignment**.  WHI shall not assign this Agreement without Barrett's prior written consent, which shall not be unreasonably withheld. An assignee of either Party, if authorized hereunder, shall be deemed to have all of the rights and obligations of the assigning Party set forth in this Agreement. It is understood that no assignment shall release the assigning Party from any of its obligations hereunder.

     **8.2**    **Notice**.  All notices required or permitted to be given by one Party to the other under this Agreement will be sufficient if sent by certified mail, return receipt requested, to the parties at the respective addresses set forth in the Master Agreement.

     **8.3**    **Governing Law**.  This Agreement shall be governed by and construed under the laws of the State of Mississippi.

     **8.4**    **Consent to Jurisdiction, Venue and Service**.  All controversies, claims, issues and other disputes arising out of or relating to this Agreement (collectively, "Disputes") shall be submitted to the Chancery Court of the First Judicial District of Hinds County, and the parties hereby submit to, and waive any objection of, venue and jurisdiction in such court with respect to such issues arising out of or relating to this Agreement.

     **8.5**    **Severability**.  If any provision of this Agreement or any Schedule attached hereto is held invalid or otherwise unenforceable, the enforceability of the remaining provisions of this Agreement and the Schedules will not be impaired thereby.

     **8.6**    **No Waiver**.  The failure by any Party to exercise any right or remedy provided for herein will not be deemed a waiver of any right or remedy hereunder.

     **8.7**    **Complete Agreement**.  The terms and conditions of this License, together with those contained in the Master Agreement, sets forth the entire understanding of the parties with respect to the IP and may not be modified except in a writing executed by both parties.

     **8.8**    **Relationship**.  The relationship between the parties created by this Agreement is that of independent contractors and not partners, joint venturers or agents.

     IN WITNESS WHEREOF, the parties have executed this IP License Agreement as of the date first written above.

*[Signature Page to Follow]*

- 4 -

*Execution Version*

**WHI:**

WORLD HEALTH INDUSTRIES, INC.

By: _____
Name: _____
Title: _____

**BARRETT:**

MITCHELL CHAD BARRETT

By: _____
Name: _____
Title: _____

- 5 -

*Execution Version*

**Exhibit A**

[NEED SOMEONE TO DESCRIBE THE IP BEING LICENSED]

4/443095.1

*Execution Version*